DOUGLAS, Appellee,

v.

OHIO BUREAU OF WORKERS' COMPENSATION et al., Appellants.

[Cite as *Douglas v. Ohio Bur. of Workers' Comp.* (1995), 105 Ohio App.3d 454.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 14509 and 14514.

Decided July 26, 1995.

*Joseph R. Ebenger,* for appellee.

*Julia Collier,* for appellant Bureau of Workers' Compensation.

*Laura G. Harrelson,* for appellant city of Dayton.

F AIN, Judge.

Defendants-appellants the city of Dayton and J. Wesley Trimble, Administrator, Ohio Bureau of Workers' Compensation, appeal from a judgment, following a jury verdict, declaring that plaintiff-appellee, Gary L. Douglas, is entitled to participate in the Ohio Workers' Compensation Fund. Case No. 14509 is the city's appeal; case No. 14514 is the Administrator's appeal. Although each defendant has appealed, only the city has filed a brief in support of its appeal. Consequently, we assume that the Administrator has chosen not to raise any issues or to assert any assignments of error beyond those asserted by the city.

The city contends that the trial court erred by failing to grant a motion for directed verdict. The city contends that Douglas failed to present sufficient evidence to establish that his injury resulted from emotional strain or tension that was any greater than that to which all workers are occasionally subjected, and also that Douglas failed to present medical testimony to establish that the emotional stress to which he was subjected as a result of his employment by the city proximately caused his injuries. We conclude that there is sufficient evidence in the record to support the jury's verdict. Accordingly, the judgment of the trial court is affirmed.

I

In November 1990, Douglas suffered a cardiac arrest while attending a meeting at Miami Valley Hospital. Subsequently, Douglas filed a claim for workers' compensation benefits requesting an allowance for "aggravation of pre-existing cardiomyopathy and cardiac arrest."

At the time of his cardiac arrest, Douglas had been employed by the city in its fire department for twenty-three years. In 1988, Douglas was a district chief. At that time, he was diagnosed as suffering from cardiomyopathy, a disease of the heart. At the recommendation of his treating cardiologist, Douglas sought reassignment to a "desk job," with shorter hours. In November 1988, Douglas accepted the position of bureau chief, emergency medical services division. In this position, Douglas assumed responsibility for administering the emergency

medical services division for the city of Dayton. In February 1989, as a result of a reorganization, Douglas became involved in a series of labor disputes. Douglas testified that by the spring of 1990, his job included the following additional responsibilities:

"Q. Now, earlier we heard mention about special projects. As a result of the Assistant Chief's promotion [the reorganization] can you tell the ladies and gentlemen of the jury what type of special projects were assigned to you over and above your stated job duties that you described earlier?

"A. In 1990—and it had been a long time to lead up to these number of months, at that time period and during—during the time of the incident, we were, of course, facing financial problems in the City.

"I was given the order to—by the city mayor at the time, we are not going to ask you to do more—we're going to ask you to do more of the same.

"It wasn't the same; it was less. I think it was a hundred thirty-six thousand dollars. I don't know the exact amount, which for my division—which was smaller than the other divisions—was a quite sizable amount of money.

"One, I'm supposed to overhaul the system. The system has serious problems and we're approaching twenty-six thousand runs with five paramedic units and twenty-four hour periods averaging twenty-some runs with no rest, not even time to eat; shortage of personnel.

"I'm also faced, at that point in time, with a lawsuit by our union on the Fair Labor Standards Act dealing with our paramedics working over forty hours a week. We had to bring that somehow to a successful conclusion, so we're working on that.

"The third thing is our senior paramedics' positions. One of my people resigned. I lost my instructor for our four hundred thirty-eight—these six people at the time have to have continuing education for maintaining E.M.T. so I'm in the process of organizing that part of my division; full time instructor and have a swing shift senior paramedic for taking up the slack and the overtime.

"I'm also charged with the responsibility of reducing my overtime, which was impossible.

"The other thing, of course—not basically which was our budget with an annual pay increase of four percent, the City charges us to keep our Department within a three percent increase. It was again impossible.

"\* \* \*

"Q. Was there anything else—did you face any deadlines with regard to each of the special tasks you just talked about?

"A. With the complete overhaul of the department, we were on a time schedule, as I understood it by Chief Hughes, and I had District Chief Paul Plummer working with me on that project as an Assistant. We were pressed for time. We had to get it done.

"Part of that was bringing on board, making a four-level response as opposed to first responder, which meant its—an engine nearest the apparatus—the—I'm trying to bring about the four-level responses so as to reduce the runs across the board, not to duplicate the services.

"Part of the plan was to train our dispatcher, and because we were facing some deadlines, I was facing a deadline on that.

"Q. Do you recall what that deadline was, sir?

"A. He wanted it on his desk by the first of the year.

"Q. First of the year being 19—?

"A. A plan—1991.

"Q. So you're working on this during 1990; is that correct?

"A. Yes.

"Q. Were there deadlines with regard to the other topics you mentioned; the budget for example?

"A. We actually had—that was due in November.

"Q. November of what year, sir?

"A. Of '90 for '91. Final.

"Q. What about the reclassification of the paramedics' position? Is there a deadline on that?

"A. That was '91.

"Q. Was there any deadlines imposed on you as a result of Fair Labor Laws, the issue?

"A. That was an ongoing thing. We didn't know really where it was going. That's something we were working on.

"Q. At that point in time, how many hours a week would you estimate you were working in 1990?

"A. I was putting in some weeks seventy hours, averaged sixty-plus hours a week."

In May 1990, the Director of the Fire Department resigned, and Douglas was named the interim director. He remained, however, the Assistant Chief for the Emergency Medical Services Division. In other words, to all of his existing

duties were added the duties of being the interim director of the Dayton Fire Department.

On the morning of November 15, 1990, while attending a work-related meeting at Miami Valley Hospital, Douglas suffered a cardiac arrest.

The meeting at Miami Valley Hospital was a routine meeting. That morning, Douglas had felt completely exhausted and recalled having asked a paramedic while he was walking down the hallway to the meeting whether he looked all right. When asked to describe the stress he was feeling in November 1990, Douglas testified that it was: "overwhelming. Again, frustration. I—it's just like I said, totally out of control at that time."

Douglas filed a claim for participation in the Workers' Compensation Fund. The initial hearing officer disallowed the claim. The regional board of review reversed the hearing officer and allowed the claim. The Industrial Commission reversed the regional board of review and disallowed the claim.

Douglas appealed the decision of the Ohio Industrial Commission to the Montgomery County Common Pleas Court. A jury returned a verdict in favor of Douglas, and judgment was entered on the verdict. From the judgment of the trial court, both the city and the Administrator appeal.

## II

The city's first assignment of error is as follows:

"Appellee failed to introduce sufficient evidence to establish that his injury resulted from greater emotional strain or tension than that to which all workers are occasionally subjected."

■ Workers' compensation claims based on stress are allowed in Ohio if the employee can satisfy the following two conditions:

1. The injury must have resulted from greater emotional strain or tension than that to which all workers are occasionally subjected, meaning that the mental or emotional stress must be unusual; and

2. The stress to which the claimant was subjected in his employment must, in fact, have been the medical cause of the injury. *Ryan v. Connor* (1986), 28 Ohio St.3d 406, 28 OBR 462, 503 N.E.2d 1379.

■ In its first assignment of error, the city contends that the trial court should have granted its motion for a directed verdict because of a failure of proof as to the first of the two conditions specified in *Ryan, supra.*

The city cites *Pence v. McSwain Carpets* (1993), 87 Ohio App.3d 793, 623 N.E.2d 201, and *Small v. Defiance Pub. Library* (1993), 85 Ohio App.3d 583, 620

N.E.2d 879, for the proposition that the mere facts that an employee is working long hours and has significant responsibilities will not satisfy the first prong of the test set out in *Ryan, supra.* In *Pence, supra,* the Court of Appeals for Hamilton County, in a two-to-one decision, upheld a finding by the trial court that the stress to which the employee in that case was exposed was not substantially greater than that to which all employees are occasionally subjected. The employee suffered an intercerebral hemorrhage while working on a year-end inventory in her position as an inventory supervisor. While this position was new to her, it was not new to her place of employment, and the trial court found that she failed to show that she was subjected to greater stress than that to which other employees were subjected.

Application of the first prong of the test set out in *Ryan, supra,* is necessarily fact-sensitive. In his separate concurring opinion, Judge Gorman opined that the decision by the trial court in *Pence, supra,* was against the manifest weight of the evidence. In the case before us, we are being asked to hold that the decision by the jury was not supported by the evidence, rather than that the evidence compelled a result in the employee's favor. Furthermore, we conclude that Douglas has presented a stronger case for having been subjected to significantly greater stress than that to which all workers are occasionally subjected. While the stress upon him in his position as Assistant Chief in charge of the Emergency Medical Services Division was at a maximum, he was required to undertake the additional duties of Director of the entire Fire Department, while retaining his responsibilities as Assistant Chief.

In *Small, supra,* a summary judgment in favor of the employer was affirmed. In that case, a director of a public library suffered a fatal subarachnoid hemorrhage while presiding over a meeting related to a project to computerize the catalog systems of her own and three other area libraries. While this project was of great importance to the employee in that case, there was no evidence that the stresses to which she was subject were significantly greater than the stresses to which every employee is subject from time to time. We agree with the city in the case before us that the issue is not whether an employee subjectively experiences greater stress than most employees ordinarily experience, but whether the stress to which the employee is subject, viewed objectively, is significantly greater than the stress to which all employees are subject from time to time.

Once again, we find the facts in the case before us to be potentially distinguishable from those in *Small, supra.* Douglas was already subject to a great deal of stress in his job as Assistant Chief, and when the additional responsibilities that he was required to undertake as interim Director of the Fire Department were superimposed upon his other duties, we conclude that a reasonable finder of fact could find that Douglas was exposed to a significantly greater stress than the

stress to which all employees are occasionally subject. Accordingly, we conclude that the trial court did not err in denying the city's motion for a directed verdict upon this ground, and the city's first assignment of error is overruled.

### III

The city's second assignment of error is as follows:

"Appellee failed to introduce sufficient evidence that the stress to which he was subjected in his employment was, in fact, the medical cause of the injury."

In addition to proving that the stress to which he is subject is significantly greater than the stress to which all employees are, from time to time, exposed, a claimant must, of course, prove that the injury for which he is seeking workers' compensation benefits was caused by the work-related stress to which he was exposed. Like any other issue of medical causation, this requires expert testimony, within a reasonable degree of medical probability, that the work-related stress caused the injury. Proof by a reasonable degree of medical probability means that the condition more likely than not caused the injury. *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97; see, also, *Wells v. Miami Valley Hosp., Inc.* (1993), 90 Ohio App.3d 840, 853–854, 631 N.E.2d 642, 650–651.

Thus, the question we are called upon to decide is whether the testimony of Douglas's medical expert, James Pacenta, M.D., is sufficient, if believed, to establish that Douglas's cardiac arrest was caused by the unusual work-related stress to which he had been exposed in the preceding weeks and months. We have reviewed both the transcript and the videotape of Pacenta's deposition, in its entirety, and we conclude that his testimony, when viewed in its entirety, is just barely sufficient to prove medical causation.

A determination whether the testimony of a medical expert is sufficient to survive a motion for directed verdict on the issue of proximate cause must be determined in light of all of the expert's testimony. *Becker v. Lake Cty. Mem. Hosp. West* (1990), 53 Ohio St.3d 202, 207, 560 N.E.2d 165, 170.

In his deposition, Pacenta testified that a person with a previous history of cardiomyopathy, like Douglas, has an increased risk of a cardiac arrest in response to stress. Pacenta testified that chronic, ongoing stress causes physical changes to the body that may, in turn, result in irregularities in the heartbeat, triggering a cardiac arrest, like the cardiac arrest in this case.

In arriving at our conclusion that Pacenta's deposition testimony, when viewed in a light most favorable to Douglas, satisfies the causation prong of the *Ryan* test, we have reviewed the entire eighty-one-page transcript of his testimony, and

our conclusion is based upon the entirety of that testimony. However, we would point to the following specific testimony:

"Q. Okay. Doctor, you gave a prior opinion in this case, I think we have discovered during your discovery deposition to Mr. Ebenger's law firm, in pursuit of the, Mr. Douglas's request for workers' compensation benefits. And it was determined that your prior opinion was not based upon a reasonable degree of medical certainty.

"However, today, you state an opinion that you say is based upon these hypothetical fact patterns that the person did have the cardiac arrest based upon an exacerbation of a preexisting cardiomyopathy condition. Your prior opinion, as I say, wasn't based upon a reasonable degree of medical certainty. Can you explain?

"MR. EBENGER [representing Douglas]: Objection because I believe that it was. The doctor said in a prior opinion more likely than not, that's medical probabilities, but you can answer, Doctor.

"THE WITNESS: Part of, and it is just my limitation in terms of some of the legal aspects—we are dealing with questions that don't have, at least from my perspective, they are grey. There is not a black and a white.

"And I think that your question about—and I think to make it clear from my standpoint, you have an individual who is clearly at increased risk for sudden death, for ventricular fibrillation, it could happen spontaneously at any time and without warning and without an inciting event.

"So that is clear that that is the case. Now *the question that I was asked was* a situation where someone is under what he perceived to be as a high degree of stress, *would that, or in a medical probability exacerbate—could that or does it aggravate a preexisting condition?*

"*Well, you have got a substrate where somebody is at increased risk. And it is my opinion, and it is just an opinion, that that is a medical probability.* But we are dealing—again, to be, and I think part of—

"Q. Okay.

"A. —the first letter that I wrote was a cause-effect and I still feel that way. If you, if you would ask me do you think that his stressful environment—just say for a supposition that this is all totally completely true, ok, and this is the kind of situation he was under, did this cause his arrest?

"I would say I don't—you know, and, I think that is the idea, *I feel I have been asked did it contribute to it, and that's the question which I was sort of addressing.*

"Again, clearly without having the underlying condition, I don't think any of this stuff would be of, of significance." (Emphasis added.)

Not long after this testimony, which was taken upon cross-examination, Pacenta conceded that something other than stress can cause arrhythmia, which would cause a cardiac arrest in a person with cardiomyopathy. However, Pacenta had previously testified that the stress to which Douglas claimed to have been exposed would likely have caused physical changes to his body that *contributed* to the cardiac arrest by making it more likely that an arrhythmia would result in a cardiac arrest.

A motion for a directed verdict is to be granted only when the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted, and that conclusion is adverse to that party. Civ.R. 50(A)(4). In the case before us, the issue is a close one. However, we conclude that when Pacenta's deposition testimony, in its entirety, is viewed in a light most favorable to Douglas, a reasonable finder of fact could conclude that the work-related stress to which Douglas was exposed contributed to the cardiac arrest for which he sought workers' compensation benefits.

The city's second assignment of error is overruled.

## IV

The city's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROGAN, P.J., and WOLFF, J., concur.